WATKINS, Judge.
This suit involves a slip and fall which occurred during renovations of Baton Rouge General Hospital. On September 28, 1984, the plaintiff[1], Mack F. Palmer, III, during the course and scope of his employment with Lanehart, Inc. as a sheet rock finisher, suffered injuries when he slipped and fell in the lobby of the Baton Rouge General Hospital. Mr. Palmer alleges that his fall was caused by a piece of cardboard allegedly placed on a marble floor which had been recently installed by employees of Menzie Tile Company.
In 1982, General Health, Inc., owner of Baton Rouge General Hospital (BRGH), entered into a general contract for renovations of BRGH with Milton J. Womack, Inc. (Womack). Pursuant to this contract, Womack hired numerous sub-contractors including Lanehart, Inc., Mr. Palmer’s employer, and Menzie Tile Company (Menzie). The plaintiff originally filed suit against General Health, Inc. as the owner of the premises, and thereafter amended his petition to bring in as additional defendants Womack and Menzie. Liability was based upon the negligence of the three named defendants or, in the alternative, the strict liability of the defendants for the defective condition of the floor upon which Mr. Palmer slipped. General Health filed a third-party demand against Womack and Menzie seeking contract indemnity for all claims, damages, losses and expenses, including attorney’s fees. Thereafter, Womack filed a third-party demand against Menzie under a similar indemnity provision in its contract with Menzie. Subsequently, Aetna Casualty and Surety Company filed a petition of intervention, asserting its subrogation rights against the defendants for reimbursement of worker’s compensation benefits paid to Mr. Palmer, and medical expenses paid on his behalf as a result of the accident. The trial court dismissed the plaintiff’s suit and found Menzie liable to Womack for attorney’s fees, including those incurred by General Health. Thereafter, Menzie filed a motion for a new trial, which the trial court granted. After reconsideration, the trial court dismissed the judgment awarding attorney’s fees. Plaintiff, as well as Aetna, General Health and *752 Womack appealed the trial court judgment. We affirm.
Plaintiff and intervenor allege that the trial court erred in its factual findings and in its finding that plaintiff failed to meet his burden of proof. General Health and Womack allege that the trial court erred in refusing to award attorney’s fees pursuant to the indemnity provisions contained in the general contract between General Health and Womack and the sub-contract between Womack and Menzie.
The- trial court made the following pertinent findings on the issue of whether the plaintiff proved that there was anything on the floor which made him fall:
The Court finds that none of the defendants are liable for the plaintiffs injuries. Plaintiff has failed to sustain the burden of proof necessary to establish by a “perponderance [sic] of the evidence” that he slipped and fell as a result of any object or deletirious [sic] substance on the floor of the hospital. Testimony on this essential and threshold issue is conflicting and fails to perponderate [sic] in plaintiffs favor.
Two persons witnessed the accident, the plaintiff and Tim Taylor, an employee of “Menzie.” Palmer testified there was cardboard on the floor and Taylor testified there was no cardboard.
Four persons went to the accident site after the accident: Gerald Blanchard, the plaintiffs foreman, Peter Nagel, the hospital night supervisor, Rayne Lorio, the Menzie foreman, and Charles Sonnier, the Womack superintendent. Blanchard and Nagel testified there were cardboard boxes on the floor. Lorio and Sonnier said there were no cardboard boxes on the floor.
There is no way to reconcile the conflicting testimony. Plaintiff also testified that he was in a “hurry” to get to the hospital cafeteria when he fell. With such conflicts in testimony over the issue of the cardboard, it is just as reasonable to believe that the sole cause of the accident was plaintiffs hurried walk rather than the plaintiff stepping on loose cardboard which caused his fall.
Plaintiff contends that the trial court’s statement that Gerald Blanchard, Peter Nagel and Charles Sonnier went to the accident site after the accident was clearly wrong and is totally unsubstantiated by the record. While it is true that the testimony of these witnesses does not establish that they went to the site of the accident immediately after the accident, the testimony does state that these witnesses did at some time later that same day visit the area in which the plaintiff fell. Although the trial court’s reasons in this regard may be misleading, they are not clearly wrong.
The testimony of the witnesses is quite divergent on the issues of where the plaintiff fell, whether there was cardboard on the floor, and whether the area where he fell was barricaded.
Mr. Palmer testified that he arrived at BRGH at approximately 6:50 a.m. on September 28, 1984, and asked his foreman, Gerald Blanchard, if he could go to the hospital cafeteria to get some orange juice before starting work at 7:00 a.m. Mr. Blanchard told him to hurry and Mr. Palmer proceeded to the cafeteria at a fast pace. Mr. Palmer further testified that when he reached the area adjacent to the admitting office he saw flat pieces of cardboard laid out like stepping stones across a newly laid marble floor. He proceeded through a door opening and stepped onto a piece of cardboard which turned and caused him to fall. He testified that no one saw him fall and that no one came to assist him after he fell. He also testified that the area in which he fell was not barricaded and that he did not know who placed the cardboard on the floor. After the fall Mr. Palmer returned to tell his foreman what had happened and thereafter proceeded to the cafeteria and then on to work.
Gerald Blanchard testified that immediately after he gave Mr. Palmer permission to go to the cafeteria, Mr. Palmer returned and told him that he had slipped and fallen on some cardboard. Mr. Blanchard testified as follows:
Q. Mr. Blanchard, you said that when Mr. Palmer left to go to the cafeteria, he came right back. Did you then *753 accompany him to the area where he said he fell?
A. No, sir.
Q. So you relied entirely upon his description of what had happened?
A. That is correct.
[[Image here]]
Q. Okay. Did you go to this lobby area at any time during the day that he said he fell?
A. Yes, sir, I walked through there.
Q. What time of day was that?
A. Just back and forth all day long.
Q. Do you remember whether or not any Menzie Tile employees were working in that area on that day?
A. That day, I can’t recall.
Q. It is possible that they were?
A. I don’t know. I really don’t know.
Q. Can you describe the composition of the floor area in that area where he fell, that is to say, had the marble already been laid and grouted or not?
A. The marble was laid and whether it was grouted or not, I don’t know. They had it covered.
Q. They had it covered with what?
A. Cardboard boxes.
Q. And that was all the way across it?
A. I can’t recall that. I know it was for parts of it for sure. I can’t recall if it was covered solid.
Q. Was there any barricade tape or rope in that area at all?
A. No.
Q. So it was entirely open as far as you recall; is that right?
A. That is right.
Peter Nagel, the assistant director of environmental services at BRGH, testified that during the renovations of the hospital he recalled seeing cardboard on the floors and specifically recalled cardboard on the marble floor being installed in the elevator area and the area adjacent to the admitting and business offices. Mr. Nagel also testified that the cardboard was generally within barricaded areas; however, he did recall picking up some cardboard which was not within a barricaded area. He did not know who put the cardboard down.
Timothy Taylor, an employee of Menzie, testified that on the morning of the accident he was standing at the end of a construction chute waiting for his foreman to arrive when he witnessed Mr. Palmer fall. His testimony concerning the fall is as follows:
Q. And you were standing there when Mr. Palmer fell?
A. Yes, I saw him when he fell.
Q. Can you describe to the judge about what rate of speed Mr. Palmer was going when he fell?
A. Okay. When he come in the elevator — it looked like he was trying to catch the elevator or something. He turned left and that is when he slipped.
Q. After he came through the chute?
A. Yes, where I was standing he passed by me.
Q. Okay.
A. When he come in like that, he speed-ed up a little bit like he was trying to catch the elevator and that is when his foot slipped out from under him.
Q. Was he within the barricaded area when he fell?
A. He was inside the barricaded area.
Q. Did you see him actually cross the barricade?
A. I did not see him step over it, but I know he was inside of it.
Q. But you know he was inside the barricaded area. Did you see any cardboard on the floor where he fell?
A. No, sir, we didn’t cover it up because I had to fill the rest of the joints.
Q. After he fell, what did he do next?
A. He jumped right up.
Q. Did he stay on the floor very long?
A. No, sir.
Q. Did you speak with Mr. Palmer after he fell?
A. I did.
Q. What was the conversation?
A. I just asked him did he hurt himself, and he told me that I am all right.
Mr. Taylor further testified that he told his foreman, Rayne Lorio, about the accident and showed him where it happened. *754 Mr. Taylor testified that he did not see cardboard used on the floors of the hospital by other sub-contractors except around the plumbing work and that Menzie never placed cardboard on the floors.
Rayne Lorio, foreman for Menzie, testified that Tim Taylor told him that he saw Mr. Palmer fall and showed him that Mr. Palmer fell between the temporary tunnel (chute) and the old existing elevator. He also testified that the area was barricaded and that there was no cardboard on the floor when he arrived. Mr. Lorio did recall at one time placing cardboard on a floor near the admitting office to keep the floors from getting scratched from heavy equipment. However, he never saw cardboard by the elevators where Mr. Taylor said Mr. Palmer had fallen. Furthermore, Menzie barricaded the areas in which they were working and the areas where the flooring was not completed.
Charles Stanley Sonnier, a superintendent for Womack, testified that during the renovation work at BRGH he was normally at the hospital from 6:30 a.m. until 4:30 p.m. He further testified that it was not unusual for sub-contractors to protect their work with cardboard or drop-cloths, however he never saw anybody putting a cardboard box over the marble floors. As superintendent he was aware of where marble tile was being laid, and he occasionally assisted in barricading the area. Mr. Son-nier was informed about Mr. Palmer’s fall the day after it occurred. He recalled that at that time the lobby area near the elevators was barricaded due to the installation of the marble flooring. He further testified that he never saw cardboard on the floor in the areas in which Menzie was installing new flooring.
Mr. Marshall Savage, carpenter foreman for Womack, testified by deposition that he did not recall seeing Menzie employees putting cardboard on the floor, and that while he worked at the hospital he never saw cardboard on the floor.
A review of the testimony as a whole suggests that at one time or another during the renovation work at BRGH cardboard was placed on the floor. However, the evidence presented does not establish by a preponderance that there was a piece of cardboard on the floor the morning that Mr. Palmer fell.
The issue of whether the plaintiffs fall was caused by a piece of cardboard on the floor of the hospital is a factual issue and such findings should not be disturbed absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial judge saw and heard all of the witnesses and concluded that there was no cardboard on the floor where the plaintiff fell. We cannot say he was clearly wrong in this determination.
The second issue for our review is whether the trial court erred in interpreting the indemnity provisions of the general contract between General Health and Womack, and the similar provisions in the sub-contract between Womack and Menzie. The trial court, in its original judgment, found Menzie liable to Womack for attorney’s fees and expenses pursuant to the contract agreement between Menzie and Womack. This contract provided full indemnification by Menzie from and against all claims, damages, losses and expenses, including attorney’s fees, which may be incurred by Womack, such expenses being inclusive of the attorney’s fees which were included in Womack’s indemnification obligations to General Health. The trial court reconsidered this issue on a motion for new trial and reversed the portion of its first judgment which awarded Womack attorney’s fees and expenses. The trial court noted the following reasons for its decision to reverse its prior judgment.
The Court failed to note in its original decision that the contract called for indemnification by Menzie only if the attorney fee claims are those “arising out of or resulting from the performance, or failure of performance, of the subcontractor’s work under this subcontract.” The Court found no negligence on the part of Menzie, therefore, under the terms of the contract Menzie is not liable to Womack or General for indemnification of attorneys fees.
The Court also holds that Womack is not liable to General for attorney fees *755 paid in defense of this suit. The contract of indemnification between General and Womack contained the same language as the Menzie-Womack contract.
“It is the terms of the indemnity agreement which govern the obligations of the parties.” Meloy v. Conoco, Inc., 504 So.2d 833 (La.1987).
General Health and Womack contend that the trial court erred in interpreting the indemnity agreements contained in the General Health/Womack contract and the Womack/Menzie contract as requiring a finding of negligence in order for the in-demnitee to recover. In the alternative, General Health suggests that if negligence is required for the indemnity provision to apply, the plain language of the contract between General Health and Womack dictates that Mr. Palmer’s negligence, as a sub-contractor employee, satisfies the negligence requirement.
General Health and Womack both argue that the agreements do not require a finding of fault. All they require is a “claim.” General Health supports its argument with the case of Treme v. American Mutual Liability Insurance Co., 260 So.2d 41 (La.App. 3d Cir.1972), writ refused, 261 La. 1055, 262 So.2d 40 (1972). The court in Treme permitted the recovery of attorney’s fees without a finding of fault on the part of the indemnitor. We find the language of the indemnity agreement[2] in Treme distinguishable from the indemnity agreements at issue. While it is true that the law permits an indemnitor, who is not at fault, to contractually indemnify an indem-nitee, who is also not at fault, such indemnity must be expressly provided for in the indemnity agreement. Cf., Meloy v. Conoco, 504 So.2d 833 (La.1987); Cannon v. Pennzoil Co., 520 So.2d 941 (La.App. 3d Cir.1987).
The pertinent provisions of the existing contract between General Health and Womack read as follows:
4.18 INDEMNIFICATION
4.18.1 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner and the Architect and their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorneys’ fees, arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph 4.18.
Womack in turn, had an indemnification clause in its contract with Menzie which reads as follows:
5.6 To the fullest extent permitted by law, the Subcontractor agrees to indemnify and hold harmless the Contractor, the Owner, the Architect/Engineer and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney’s fees, arising out of or resulting from the performance, or failure in performance, of the Subcontractor’s Work under this Subcontract, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (2) is *756 caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable regardless of whether it is caused in part by a party indemnified hereunder. Such obligations shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph 5.6.
As set forth by the trial court in its reasons for judgment, it is the indemnity agreement which governs the obligations of the parties. Meloy, 504 So.2d 833. In the instant case, the indemnity agreements contained in each contract clearly state that the party is entitled to indemnity “... PROVIDED that any such claim ... (1) is attributable to bodily injury ... AND (2) is caused in whole or in part by any negligent act or omission of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them ...” (Emphasis added). Unlike the indemnity provisions found in Treme, Meloy and Cannon, the provisions of the present indemnity agreements do not provide for indemnity without a finding of fault on the part of the indem-nitor or a party for whom the indemnitor is responsible.
General Health’s alternative argument contending that the plaintiff's negligence is sufficient to satisfy any negligence requirements under the indemnity agreement is unsupportable under the facts of the instant case. The trial court did not find the plaintiff negligent, nor does the record support such a finding. Therefore, General Health is not entitled to indemnity under the General Health/Womack contract, nor is Womack entitled to indemnity under the Womaek/Menzie contract.
For the reasons expressed, the judgment of the trial court is affirmed, all costs to be paid by the appellants.
AFFIRMED.

. We note that the petition named Mack F. Palmer, III, individually and as the natural tutor of Mack F. Palmer, IV and Erika A. Palmer, and Yvette Palmer (wife of Mack F. Palmer, III) as plaintiffs.

. "The contractor agrees to indemnify, save and hold harmless the owner and engineer from all claims, demands, or causes of action, whether for property damage, personal injuries or death, arising or growing out of the performance of the contract by the contractor, including all court costs and attorney’s fees; but any such indemnity shall not apply to any claim of any kind arising out of the existence or character of the work.” (Emphasis in original). Treme v. American Mutual Liability Insurance Co., 260 So.2d 41 (La.App. 3d Cir.), writ refused, 262 So.2d 40 (La.1972).